David J. MUHLY, et al., Plaintiffs,

v.

Michael ESPY, Secretary of the U.S. Depart. of Agriculture, et al., Defendants.

Civ. A. No. 94–0634–R.

United States District Court, W.D. Virginia, Roanoke Division.

Jan. 18, 1995.

dan, Michael B. Wigmore, Swidler & Berlin, Chtd., Washington, DC, for amicus Appalachian Power Co.

Stephen Allen Isaacs, William S. Bilenky, Law Office of Stephen A. Issacs, Richmond, VA, for plaintiffs.

Robert P. Crouch, Jr., U.S. Atty., Richard A. Lloret, U.S. Attorney's Office, Roanoke, VA, for defendants.

H. Allen Glover, Jr., William B. Poff, Michael J. Quinan, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, J. Phillip Jor-

## MEMORANDUM OPINION

TURK, District Judge.

Plaintiffs brought this action pursuant to the citizen suit provision of the Administrative Procedure Act (APA) seeking a Writ of Mandamus to compel the Defendants to perform alleged non-discretionary duties. 5 U.S.C. § 702 and 28 U.S.C. § 1361. They claim they were excluded from the "scoping" process conducted by the Defendants in conjunction with Appalachian Power Company's (APCo) proposal for the construction of a high-voltage transmission line.[1] By denying their participation, the Plaintiffs believe the Defendants have acted in violation of the National Environmental Policy Act (NEPA) and the regulations promulgated to implement its provisions. 42 U.S.C. §§ 4321–4370c and 40 C.F.R. § 1501.7(a)(1), (c) (1993).[2] In addition, the Plaintiffs claim that their constitutional rights to equal protection and due process of law have been violated. Insisting that they have no other remedy, they seek an order from this court instructing the Defendants to reopen the scoping process to include their input.[3]

The matter is presently before the court on the Defendants' motion to dismiss. Fed. R.Civ.P. 12(b)(1) and 12(b)(6). The Defendants base their motion on several grounds. First, they argue that the court does not

---

1. Scoping is an early and open process used by federal agencies to determine the range of issues to be analyzed in an Environmental Impact Statement and to identify significant issues related to a proposed major federal action. 40 C.F.R. § 1501.7 (1993). Scoping is to be conducted by the designated lead agency as soon as practicable after a decision to prepare an Environmental Impact Statement has been made. *Id.*

2. The alleged non-discretionary duties, which the Plaintiffs believe the Defendants have violated, are found in paragraphs (a)(1) and (c) of regulation § 1501.7.

   (a) As part of the scoping process the lead agency *shall:*
   (1) *Invite the participation of* affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other *interested persons* (including those who might not be in accord with the action on environmental grounds) ...

   (c) An agency *shall* revise the determinations made under paragraph (a) and (b) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposed or its impacts. (emphasis added).

3. The Plaintiffs are comprised of individuals who own real estate or reside in proximity to the preliminary alternative routes being considered for the proposed construction of APCo's transmission line. Specifically, these areas are Montgomery, Bland, Pulaski, and Giles counties in Virginia. The Defendants include: Michael Espy, Secretary of the United States Department of Agriculture; Joy E. Berg, Forest Supervisor for the Jefferson National Forest; Roger Kennedy, Director of the National Park Service; and Lt. Gen. Arthur E. Williams, Chief of Engineers, the United States Army Corps of Engineers. In addition, the Appalachian Power Company has submitted briefs to the court as amicus curiae in this matter.

have jurisdiction to hear the Plaintiffs' claims because no final agency action has taken place and because the Plaintiffs have failed to exhaust all available administrative remedies. Further, based on the character of the injuries the Plaintiffs claim to have sustained, the Defendants believe they lack standing to allege violations of NEPA. Lastly, they argue that the remedy of mandamus is inappropriate because scoping is a process left entirely to agency discretion.

A hearing on the Defendants' motion was held before this court on December 16, 1994. At that hearing, counsel for both sides appeared and presented oral argument. The court took the motion under advisement and suggested that the parties' attempt to reconcile their differences. Unfortunately, the parties have informed the court that settlement is not probable. As such, this matter is now ripe for the court's decision.

Having thoroughly reviewed the record, the parties' pleadings, and the pertinent case and statutory law, the court finds that it must grant the Defendants' motion. No final agency action has occurred with respect to APCo's proposal. Therefore, the court does not have jurisdiction to intervene in this matter.

## I. BACKGROUND

On March 5, 1991, APCo submitted an application to the United States Department of Agriculture's Forest Service (USFS) requesting authorization for right-of-way running two hundred feet wide and twelve miles long. If granted, the easement will be used to construct a 765kV high-voltage transmis-sion line across lands under the jurisdiction of the Forest Service, the National Park Service, and the United States Army Corps of Engineers. (Compl.Ex. A). Specifically, the federal land under consideration involves a section of Jefferson National Forest (JNF), as well as, segments of the Appalachian National Scenic Trail, and New River at Blue Stone Lake. (Compl.Ex. B).[4]

After initial consideration of the proposal, the federal agencies determined that construction of such a line constituted a "major federal action," which could significantly affect the environment. *See* 40 C.F.R. § 1508.18 (1993). Thereafter, USFS was selected as the lead agency to analyze the project's potential impact and to prepare the requisite Draft Environmental Impact Statement (DEIS) and the Final Environmental Impact Statement (FEIS). *See* 40 C.F.R. §§ 1502.1–1503.4 (1993). The National Park Service and the US Army Corps of Engineers were designated as cooperating agencies for these activities.

Under NEPA, federal agencies are required to develop alternatives to proposed major federal actions, including the option of "no action". NEPA § 102(2)(C)(iii); 102(2)(E) and 40 C.F.R. §§ 1502.1, 1502.14 (1993). In this case, that required the development of alternative routes to the corridor identified in APCo's proposal to the USFS.[5] In a letter entitled "Friends of the Forest" and dated November 18, 1991, JNF's Forest Supervisor stated that preliminary alternative routes would be considered from areas in Botetourt, Roanoke, Craig and Giles counties

**4.** In addition to the federal land, the line would also traverse private land in the Commonwealth of Virginia and the state of West Virginia. In total, APCo's preferred route would cover approximately 115 miles from Oceana, West Virginia to Cloverdale, Virginia. The federal agencies have no jurisdiction over private lands. Thus, APCo is also in the process of seeking approval for the line from the Virginia State Corporation Commission (VSCC) and the West Virginia Public Service Commission (WVPSC). The record reveals that APCo filed an application for a Certificate of Public Convenience and Necessity with the VSCC in October of 1991. Sometime thereafter, APCo also petitioned the WVPSC for a similar certificate. The WVPSC application was later withdrawn at the request of the state agen-cy. APCo accommodated this request and plans to refile its petition at a later date. *See* (Amicus Curiae Reply Br.Ex. 2).

**5.** It should be noted that a contract was entered into with Virginia Polytechnic Institute and State University and West Virginia University to develop potential route locations for the line. In 1991, after approximately one year of analysis, experts from the two universities arrived at a route which they believed minimized potentially negative effects on the environment. APCo claims that the environmentally preferred route arrived at by the universities is the one identified in its proposal to the USFS. *See* (Amicus Curiae Br. in Supp. at 2 n. 2).

in Virginia. (Tier One Counties) (Compl.Ex. B).

As the initial step in the agencies' studies, the USFS had a Notice of Intent (NOI) published in the Federal Register on November 21, 1991. 40 C.F.R. § 1508.22 (1993). The publishing of the NOI marked the beginning of the public's involvement in the process known as "scoping". *See* (Compl.Ex. C). After the NOI was published, a series of letters and update briefings were issued by the USFS and JNF. The purpose of this correspondence was to keep the public aware of the progression of the agencies' studies and to invite citizens to public meetings where they could voice their opinions. The record reveals that at least six of these meetings were conducted during the scoping process, however, none of them were held in the Plaintiffs' counties. (Compl.Ex. D).

On November 22, 1992, a third briefing paper was issued by JNF. The newsletter stated that, "an important milestone in the analysis of the proposal was reached on May 22, 1992, with the completion of the first step in the public involvement (scoping) process." (Compl.Ex. D). Under a heading entitled "What's Next", the document stated that the federal agencies would now begin to decide

which of the issues raised by the scoping were significant enough to be discussed more fully in the DEIS and FEIS. (Compl.Ex. D).

The Plaintiffs maintain that, prior to June of 1994, the Defendants never indicated that any areas, other than those in Tier One Counties, were under consideration as possible alternative routes for the APCo line. However, this changed on June 21, 1994, when the USFS published a "Revised Notice" that indicated that the areas under consideration included, not only Tier One Counties, but also, parcels in Montgomery, Bland, and Pulaski counties. (Tier Two Counties).[6]

Upset with what they perceived as the Defendants' preferential treatment of neighboring counties to their north, a joint letter was written by two citizen groups to JNF's Forest Supervisor requesting that the scoping process be reopened. (Compl.Ex. G). Such a remedy was justified, they explained, because it was imperative that citizens of Tier Two Counties be included in the scoping process if the Defendants were going to site preliminary alternative routes near their homes. This request was denied by JNF's Forest Supervisor on July 5, 1994.[7] (Compl.Ex. H).

---

**6.** There were additional lands from Giles county included in this revised NOI. Certain members of the Plaintiffs' group are persons residing on or owning land in these added areas. All of the other Plaintiffs are affiliated exclusively with Tier Two Counties.

**7.** The letter rejecting the citizen groups' request to reopen scoping is significant to this litigation. Therefore, the majority of the letter is provided below.

Scoping is one of the initial steps in the preparation of an Environmental Impact Statement (EIS). One purpose of scoping is to determine the scope and the significant issues to be analyzed in depth in the EIS. In November of 1991 we published a Notice of Intent to prepare an EIS and requested comments on the proposed action. *This formal scoping of public comments ended in May 1992. From the comments we received, we developed the significant issues for the EIS. Based on the significant issues and resource inventories, we developed alternatives to the original proposal.* In responding to an issue concerning the Appalachian Trail, we added an alternative corridor which passes near the Giles/Bland and Giles/Pulaski borders. We added an alternative which passes through a portion of Montgomery County in response to the issues of

land use plans. It is our policy and a requirement of our Forest Land and Resource Management Plan (LRMP) to examine alternatives off National Forest lands. Our LRMP also requires us to examine the use of existing corridors. *Since scoping is an initial step in the process, it cannot be restarted.*
*We will continue our public involvement efforts. We have scheduled the meetings next week, in part, because we knew we were considering alternative corridors in areas which were not in close proximity to the original proposal. We selected Narrows as a meeting site to better serve people potentially interested in the southern alternatives.* We will be happy to provide materials to people who are new to the EIS process, to help them understand the process. *If the new alternatives generate new issues, we will consider them.* At the public meetings we will be accepting information related to the location of resources within or near the corridors which we are studying. As part of our public involvement process we will accept comments on the resources affected by the corridors and on new issues which may surface. Given the stage we are at in the EIS process, any comments would be most useful if received promptly.
*People will also have another chance to comment on the alternatives after the Draft EIS is*

After denying the request to reopen scoping, the agencies finally announced the preliminary alternative routes for the APCO line. Among those identified were sites running through Tier Two Counties. During July of 1994, additional informational hearings were held to discuss the selected preliminary alternative routes. According to a JNF release, these meetings were to review "preliminary alternative transmission line corridors developed in response to public issues and agency concerns developed in 1992 and 1993." (Compl.Ex. J). Maps depicting these routes were published in local newspapers and distributed to the media. In addition, maps were furnished to citizens on an as-requested basis. In total, there were seven meetings conducted after the agencies identified the preliminary alternative routes to the public.

Despite these additional opportunities to be heard, the Plaintiffs claim that they have been injured by their exclusion from the scoping process. They believe the Defendants have secretly and invidiously used data from scoping conducted with citizens of Tier One Counties to identify preliminary alternative routes in Tier Two Counties. (Compl. at 15); (Pls' Br. in Opp. at 4). Without a reopening of the scoping process, they believe additional meetings with the federal agencies will be pointless. This is true because, according to the Plaintiffs, the Defendants have already defined the scope of the analysis to be considered. Therefore, additional meetings will only serve to narrow those issues already fixed.

To date, the agencies' studies have yet to be completed and public participation in post-scoping activities is being actively encouraged. Furthermore, neither the Commonwealth of Virginia nor the state of West Virginia has issued a certificate of need for the line's construction. Va.CODE ANN. §§ 56–

265.1 through 56–265.9 (Michie 1986); W.VA. CODE ANN. § 24–2–11a (Michie 1994).

## II.

On a motion to dismiss, the court must view the allegations in the complaint in the light most favorable to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Revene v. Charles County Com'rs,* 882 F.2d 870, 872 (4th Cir.1989).

## III.

The Plaintiffs have brought this action under the APA's citizen suit provision alleging that the Defendants have violated NEPA and the regulations promulgated to enforce its goals. NEPA was enacted to ensure that federal agencies seriously consider environmental factors, along with their other mandates, before deciding on a particular course of conduct. *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 193–94 (1991), *cert. denied,* 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991). However, NEPA itself does not provide a private right of action for violations of its provisions. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990); *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). Instead, as here, citizens can force governmental compliance with NEPA by bringing suit against a delinquent agency under § 10(a) of the APA.[8]

When judicial review of an agency's action is based on the general review provisions of the APA, rather than pursuant to a

---

*released.* Comments made on the DEIS will be analyzed and addressed in the Final EIS.
We must go through a number of steps to complete an EIS. *While it is not possible to repeat the scoping process, we do want to give your group, and others in the area, an opportunity to be involved in our process. We hope that you will be able to attend one of our public meetings and will provide us information which*

*will assist us in our analysis of the alternatives.* (emphasis added).

8. The citizen suit provision of the APA states:
"A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

cause of action created under a substantive statute, the action sought to be reviewed must be "final agency action." *Lujan,* 497 U.S. at 894, 110 S.Ct. at 3191–92. ("Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, [the Court] intervene[s] in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened affect") (citation omitted); *Public Citizen v. Office of U.S. Trade Representatives,* 970 F.2d 916, 921 (D.C.Cir.1992); *Westvaco Corp. v. U.S.E.P.A.,* 899 F.2d 1383, 1387 (4th Cir.1990). This finality requirement is a jurisdictional prerequisite and is found in 5 U.S.C. § 704, which provides:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. *A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.* (Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 392.) (emphasis added).

■ Therefore, the initial issue before this court is whether or not final agency action has taken place making the Defendants' conduct judicially reviewable. It seems appropriate that the first place to begin this analysis, and the source worthy of the most deference, are the regulations promulgated by the Council on Environmental Quality (CEQ). Those regulations are the backbone of NEPA and they give the Act its "action-forcing" character. *See* 40 C.F.R. § 1501.1 (1993). Under the CEQ regulation entitled "Mandate", 40 C.F.R. § 1500.3 (1993), the Council states when judicial review of an agency's compliance with NEPA should occur.

It is the Council's intention that judicial review of agency compliance with these regulations *not occur before an agency has filed the final environmental impact statement,* or has made a final finding of no significant impact ..., *or takes action that will result in irreparable injury.* Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action. (emphasis added).

Consistent with the CEQ's position, courts have been reluctant to review agency behavior unless a FEIS has been filed or the agency has determined that no statement is needed. *Kleppe v. Sierra Club,* 427 U.S. 390, 406, n. 15, 96 S.Ct. 2718, 2728 n. 15, 49 L.Ed.2d 576 (1976) ("[T]he time at which a court enters the process is when ... someone protests either the absence or the adequacy of the final impact statement ... this is the point at which an agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption."); *Public Citizen,* 970 F.2d at 919 ("[T]he Supreme Court has clearly stated that judicial intervention is not proper just because the time to start work preparing an EIS has arrived."); *Committee Against R.R. Relocation v. Adams,* 471 F.Supp. 142, 146 (E.D.Ark.1979) ("It is well established that draft EIS's [sic] are not subject to judicial review."); *Sierra Club v. Mason,* 365 F.Supp. 47, 49–50 (D.Conn.1973) (alleged flaws in preparation of draft statement not subject to judicial review until FEIS issued).[9] Furthermore, the court is unaware of any decision in which an agency's compliance with NEPA has been reviewed prior to the issuance of a DEIS.

---

9. In *Natural Resources Defense Council, Inc. v. U.S.E.P.A.,* 16 F.3d 1395, 1407 (4th Cir.1993), the Fourth Circuit presented a four factor test for determining whether agency action is final such that judicial review can be exercised under the APA. They were: (1) whether the action is a definitive statement of the agency's position; (2) whether the action had the status of law and immediate compliance with its terms was expected; (3) whether the action had a direct impact on the day-to-day business of the plaintiff; and (4) whether pre-enforcement challenge was calculated to speed enforcement and prevent piecemeal litigation. (citing *F.T.C. v. Standard Oil Co.* of *California,* 449 U.S. 232, 239–40, 101 S.Ct. 488, 493–94, 66 L.Ed.2d 416 (1980)). *See also Abbott Laboratories v. Gardner,* 387 U.S. 136, 151, 87 S.Ct. 1507, 1516–17, 18 L.Ed.2d 681 (1967) (presenting a similar test). Reviewing these criteria with respect to the facts in this case, it is clear to the court that final agency action has not taken place. The Defendants have recommended preliminary alternative routes for the transmission line. These alternatives will be closely analyzed in the upcoming months and the plaintiffs have been expressly invited to give their views on the potential environmental effects of APCo's line.

In this case, the Defendants have decided that APCo's proposal calls for "major federal action" and necessitates the creation of an environmental impact statement. They have published a NOI, as well as several revisions to it. In addition, the scoping process has been completed and preliminary alternative routes have been established. However, all of these steps mark the infancy, not the termination, of the NEPA process. This is clear when one considers what remains to be done. Among the stages left to be completed are: the issuance of a DEIS; public comment during a compulsory forty-five day waiting period; and the issuance of a FEIS. All of these stages require substantial input from the public, during which, the Plaintiffs could conceivably cure any of the defects in the NEPA process they believe have taken place so far.

In addition, as the court made clear to both parties during oral argument, unless a certificate of need is issued for the transmission line by the Commonwealth and the state of West Virginia this litigation is moot. While state evaluation of APCo's proposal does not excuse the Defendants from complying with the requirements of NEPA, it could render any decision made by this court ordering the scoping process to be reopened little more than judicial fiat. *See Committee Against R. Relocation,* 471 F.Supp. at 146 (declining to grant injunctive relief because it would necessarily constitute an advisory opinion as to prospective actions to be taken by defendants). The court is also of the belief that such an order would come perilously close to the type of judicial "hybrid rule making" strictly forbidden by earlier Supreme Court decisions addressing NEPA. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 552–58, 98 S.Ct. 1197, 1216–19, 55 L.Ed.2d 460 (1978).

Based on these facts, the court finds that there has been no final agency action. At present, the Defendants have not completed their decision making process nor has any definitive determination been made that the court believes could cause the Plaintiffs permanent hardship. *See Franklin v. Massa-*

*chusetts,* —— U.S. ——, ——, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). As such, the court does not have jurisdiction to review the claims raised by the Plaintiffs.

## IV.

As a final matter, the court feels compelled to address the Plaintiffs' claims that their omission from the scoping process has irreparably harmed them and that additional meetings with agency personnel will be meaningless. While the court appreciates the Plaintiffs angst, understandably brought on by the specter of a major utility line being constructed through their backyards, the court cannot agree that they no longer have a voice in the matter. Support for the court's position, ironically, is found in the very case that the Plaintiffs believe mandates a reopening of the scoping process. *Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588 (9th Cir.1988).

In *Northwest Coalition,* the appellant, (NCA), raised the same arguments made by the Plaintiffs in this case. NCA argued that the CEQ scoping regulation, § 1501.7(a)(1), is mandatory and that as an interested party it should have been included in the scoping performed by the defendant. *Id.* at 594–96. Further, NCA argued that if it could have presented its comments earlier "the scope of the [defendant's] program might have been enlarged" and the federal agency would have been "more receptive to [NCA's suggested] alternative." *Id.* at 596. The Ninth Circuit agreed with the appellant that § 1501.7 imposes a mandatory duty upon federal agencies to notify interested parties that scoping has been initiated and stated that the defendant had "violated the spirit and the letter of [NEPA]" by not including NCA in the scoping process. *Id.* at 595. Nevertheless, the Court ruled against the appellant because NCA could not establish that it had been prejudiced by its omission from the scoping.

As the Ninth Circuit explained, "[i]t is well settled that prejudice must be demonstrated before administrative decision-making can be set aside." *Id.* at 595.[10] Further,

10. As support for this proposition, the Ninth Cir-

cuit cited the Fourth Circuit's decision in *Provi-*

they reasoned that NCA was unable to show prejudice because it had participated *early in the EIS process. Id.* at 596. The early involvement the Court pointed to was NCA's submission of a written commentary addressing perceived flaws in the defendant's draft EIS. These comments were considered by the Defendants and included in its FEIS. The Court concluded by saying that, although the violation of the scoping provision was regrettable, NCA was not prejudiced because it clearly participated in the NEPA process and communicated its views.

In this case, the comment period on the DEIS has not even begun because the DEIS has yet to be created. As such, the court does not comprehend how the Plaintiffs have been irreversibly harmed. There is simply no reason why the Plaintiffs cannot present their views in the upcoming meetings scheduled by the Defendants. This would include their claim that the scope of the analysis needs to be expanded due to particular environmental concerns of Tier Two Counties. Reviewing the correspondence between the Plaintiffs and the Defendants, it appears that the federal agencies have offered the Plaintiffs a forum in which to be heard. Nothing has been presented to the court which would indicate that this invitation was made in bad faith. Nor can it be said, contrary to the Plaintiffs' belief, that there has been a concerted effort on the part of the Defendants to engage in an "administrative process by ambush." (Compl. at 18).

### V.

In summary, the court finds that it lacks jurisdiction to entertain the claims raised by the Plaintiff. No final agency action has taken place. As such, the APA does not provide a cause of action for the Plaintiffs. Further, because the court's lack of jurisdiction mandates dismissal of this case, the other issues raised by the Defendants need not be addressed. An appropriate order will be entered this day.

### ORDER

In accordance with the written Memorandum Opinion entered this day, it is hereby **ADJUDGED AND ORDERED** that the Defendants' motion to dismiss be **GRANTED.**

---

*dence Road Community Ass'n v. E.P.A.,* 683 F.2d 80 (4th Cir.1982). In *Providence,* the Fourth Circuit held that property owners who were not given proper notice of public hearings on a proposed waste-water treatment plant did not suffer prejudice. The Court noted that although the plaintiffs did not "participate until the eleventh hour, their comments were received and considered by the EPA before the agency reached its final decision not to prepare an EIS." *Id.* 82. The Court concluded, "there must be an end to the process somewhere ... otherwise, so long as there are 'unexplored and undiscussed alternatives that inventive minds can suggest,' there would never be a federal project." *Id.* at 83 (citing *Fayetville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1027 (4th Cir.1975)).